1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                      NORTHERN DIVISION

4

5   UNITED STATES OF AMERICA

6       vs.                    CASE NO.:  2:07cr61-MHT

7   BANKOLE BABAJIDE BALOGUN,

8           Defendant.

9

10                  * * * * * * * * * *

11                  JURY TRIAL PROCEEDINGS

12          EXCERPT OF TESTIMONY OF ADELEKE TAIWO

13                  * * * * * * * * * *

14          BEFORE THE HONORABLE MYRON H. THOMPSON, UNITED STATES

15   DISTRICT JUDGE, at Montgomery, Alabama, on Friday, September 21,

16   2007, commencing at 9:01 a.m.

17   APPEARANCES:

18   FOR THE GOVERNMENT:     Mr. Stephen P. Feaga
19                           Mr. Christopher A. Snyder
                             Assistant United States Attorneys
20                           OFFICE OF THE UNITED STATES ATTORNEY
                             131 Clayton Street
21                           Montgomery, Alabama  36104

22   FOR THE DEFENDANT:      Mr. Michael V. Rasmussen
                             Attorney at Law
23                           130 Inverness Plaza, Suite 175
                             Birmingham, Alabama  35242

24

25

```
 1   APPEARANCES, Continued:

 2   FOR ADELEKE TAIWO:        Mr. Richard Benjamin White, Jr.
                               Attorney at Law
 3                             VICKERS, SMITH & WHITE
                               22 Scott Street, Second Floor
 4                             Montgomery, Alabama  36104

 5              Proceedings reported stenographically;
                  transcript produced by computer.
 6
                      * * * * * * * * * *
 7

 8      (The following excerpt of proceedings was heard before the

 9       Honorable Myron H. Thompson, United States District Judge,

10       at Montgomery, Alabama, on Friday, September 21, 2007,

11       commencing at 9:01 a.m.:)

12      (Jury not present)

13           THE CLERK:  Remain seated.  Court is in session.

14           THE COURT:  Now, do you wish to call Mr. Taiwo as a

15   witness?

16           MR. RASMUSSEN:  I do, Your Honor, but subject to what

17   I'm about to talk about, which is -- it's based on that.  I

18   learned -- yesterday Mr. Taiwo spoke to -- we anticipated

19   calling him yesterday.  And I learned that the night before, on

20   the eve of his testimony -- by secondhand, so I'm not positive

21   about everything that's involved here -- that the government

22   went to Mr. Taiwo and offered him a plea deal, the deal being,

23   in substance, as I understand it, that if he were to cooperate

24   with the government and testify against his codefendants, that

25   he might serve -- he might get a sentence for perhaps time
```

1   served or perhaps a year or more but that if he were to testify

2   and were to testify falsely, that the government could charge

3   him with obstruction and he might get six or seven years.

4          Of course, what's at issue here and why that may be

5   relevant at the trial is that Taiwo's credibility is a central

6   issue in this case.  The government has already attacked that

7   credibility.  He is a key witness in our case.  And his

8   understanding -- regardless of what the government intended, his

9   understanding of what he was offered affects the jury's view of

10  that credibility.  In other words, if a witness is told that,

11  well, if you testify for the defendant and the government's

12  going to pound you, there's a risk that the government is going

13  to pound you, then it's more likely that if he does testify,

14  he's telling the truth.

15         And, you know, I -- I question the judgment of the

16  government in making this offer on the eve of his testifying.  I

17  think the perception is that the government was trying to

18  strong-arm the witness.  Now, I'm not saying that's true, but

19  that's -- so you have a prejudice and probative value balancing

20  test here.  You know, I could have sprung this during the

21  examination; but I think in fairness to Mr. Feaga and

22  Mr. Snyder, of whom I have the highest respect, I thought it was

23  best to air this before he testifies.

24         THE COURT:  What are you asking me, then?

25         MR. RASMUSSEN:  I'm just saying -- alerting the Court

1    to the fact that I may ask him what did the government tell you

2    last night.

3              THE COURT:  Fine.  Okay.

4              Yes.  Anything else, Mr. Snyder?

5              MR. SNYDER:  Am I to understand that the Court's going

6    to allow this sort of questioning?

7              THE COURT:  Did the government make an offer to him?

8              MR. SNYDER:  Yes.

9              THE COURT:  Assuming he doesn't invoke the Fifth and so

10   forth.  I don't know whether we'll reach that point, but I can't

11   say that I won't.

12             MR. SNYDER:  Okay.  Well, I just want it to be on the

13   record that that -- Mr. Rasmussen doesn't know the entire

14   history of the plea negotiations.

15             THE COURT:  Well, I agree with that.  When I say I

16   agree with it, I can understand that.  I don't know what

17   Mr. Taiwo is going to say.

18             MR. SNYDER:  Okay.  I don't think anyone --

19             THE COURT:  But I mean I'm assuming that he may go into

20   what promises have been made to him.  And assuming that any

21   evidence from Mr. Taiwo comes in, that may very well be part of

22   it.

23             Are we ready to proceed?

24             MR. RASMUSSEN:  Yes, Your Honor.

25             THE COURT:  Okay.  Well, call Mr. Taiwo, then, if you

1  want to.

2  MR. SNYDER:  Excuse me.  Your Honor, if I may just put

3  on the record exactly what our discussions have been through

4  Mr. Taiwo's attorney.

5  THE COURT:  Okay.

6  MR. SNYDER:  Mr. White has been retained as counsel.  I

7  believe I had some preliminary discussions with Mr. Taiwo's

8  previous attorney, Mr. Urech, in which I told him that there was

9  going to be a superseding indictment in this case and I thought

10  at that point plea discussions were premature.

11  And then at some point after Mr. White was retained, he

12  came over to my office -- and we also had several telephone

13  conversations -- in which I essentially made the same plea deal

14  to Mr. White, although I didn't specifically say what the ranges

15  that he could possibly be -- Mr. Taiwo could possibly be facing

16  because it was -- as I indicated to him last night, it's almost

17  impossible for me to say what substantial assistance the

18  government would be willing to provide until Mr. Taiwo came in

19  and gave us a proffer.

20  I said assuming -- and I said assuming -- that he were

21  to be completely honest and give us the information that he

22  knows regarding this conspiracy and we were able to evaluate it

23  and admit his involvement and corroborate, then I think that a

24  very favorable deal could be worked out which would --

25  assuredly, he would be able to be going back to Nigeria as

1    quickly as -- as possible.  But I said that's a huge assumption,

2    because I have -- and it's almost impossible for me to give you

3    any idea of what it would be because of the fact that I don't

4    know what he's going to say.  And I keep saying come in and have

5    him meet with us.

6            And then Mr. White asked me what are the possible

7    ranges that he could be facing otherwise.  I said, well, I think

8    it's extremely dangerous for your client to take the stand and

9    testify because if he obstructs justice, there's possible other

10   charges or sentencing enhancements that he could face.  If he's

11   found guilty of this entire conspiracy, which we believe

12   involves approximately 250 to $300,000 worth of loss, that he

13   could be facing quite a bit of time.  And I said I don't know

14   what that would be.  I guess it would be around five, six years

15   or something like that.

16           So that was the sum and substance of my conversation

17   with Mr. White with essentially a little bit more detail of the

18   things that I had told him before, because he kept pressing me

19   on saying, well, give me something that I can tell my client

20   about what he's going to be facing if he helps you versus if he

21   doesn't help you.  And I told him it's hard for me to say,

22   because I don't know exactly what it is that he's going to be

23   saying.

24           Now, I think that there are several rule -- there's a

25   rule that deals with plea discussions.  I'm not exactly certain

1  if that applies to third-party plea discussions.  I guess we'll

2  address that at the time when it comes in up.

3           THE COURT:  Okay.  Very good.  Anything else?

4           MR. RASMUSSEN:  No, Your Honor.

5           THE COURT:  Okay.  Bring Mr. Taiwo in.

6           MR. FEAGA:  Your Honor, I think the key thing here we

7  want the Court to understand is these were discussions between

8  Mr. Snyder and a lawyer, not between Mr. Snyder and Taiwo.

9           THE COURT:  Okay.

10          MR. SNYDER:  I've never met Mr. Taiwo until -- this is

11 the first time I've seen him in my life.

12          THE COURT:  Okay.  Very good.

13     (The witness is sworn)

14          THE COURT:  Go ahead.

15          MR. RASMUSSEN:  Your Honor, with respect to that last

16 comment, I think we all understand that a defense attorney is

17 duty bound to convey conversations like that to his client.

18          THE COURT:  Okay.  Go ahead.

19          **ADELEKE TAIWO**, the witness, having been duly sworn,

20 testified, as follows:

21                      DIRECT EXAMINATION

22 BY MR. RASMUSSEN:

23 Q.  All right.  Tell us your name, please.

24 A.  My last name Taiwo, my first name Adeleke.

25 Q.  Mr. Taiwo, how old are you?

```
 1   A.   24.

 2   Q.   Are you --

 3            MR. SNYDER:  I'm sorry to interrupt.  Could you please

 4   move up to the microphone?

 5            THE COURT:  Yes.  I can barely hear you.

 6            MR. SNYDER:  And move it down and speak up so that we

 7   can hear you.

 8            THE WITNESS:  Okay.

 9   Q.   Are you a defendant in this case?

10   A.   Yes, sir.

11   Q.   And you have retained an attorney, who is present,

12   Mr. White; is that correct?

13   A.   Yes, sir.

14   Q.   And Mr. White has had some discussions with you?

15   A.   Yes, sir.

16   Q.   He's given you some advice.

17   A.   Yes, sir.

18   Q.   Has he advised you of your right to refuse to testify?

19   A.   Yes, sir.

20   Q.   Has he advised you that anything you say can and will be

21   used against you?

22   A.   Yes, sir.

23   Q.   Has he advised you of the various dangers of testifying?

24   A.   Yes, sir.

25   Q.   And has he advised you of what the government has offered to
```

1  you for you to testify or not testify or take -- make different

2  decisions?

3  A.  Yes, sir.

4  Q.  All right.  Based on that, are you, nevertheless, willing to

5  personally -- your attorney has advised you not to testify.

6  A.  Yes, sir.

7  Q.  And regardless of that, are you still willing and do you

8  still desire to testify in this case?

9  A.  Yes, sir.

10  Q.  Do you desire to --

11        THE COURT:  I still have to make the examination on

12  this.  I still have to ask him those questions.

13        MR. RASMUSSEN:  I'm sorry.  I thought you wanted me to

14  go forward.

15        THE COURT:  I have to inform him of his Fifth Amendment

16  right before he testifies.

17        Now, you do understand that you do have a right under

18  the Fifth Amendment to the Constitution not to incriminate

19  yourself?

20        THE WITNESS:  Yes, sir.

21        THE COURT:  Do you know what I mean by incriminate

22  yourself?

23        THE WITNESS:  Yes, sir.

24        THE COURT:  What does that mean?

25        THE WITNESS:  Like whatever I say now, it can hurt me

1    in my own case.

2              THE COURT:  It could hurt you in your own case.

3              THE WITNESS:  Yes, sir.

4              THE COURT:  In other words, it could support a

5    conviction against you.

6              THE WITNESS:  Yes, sir.

7              THE COURT:  And you have a right not to give testimony

8    that could be against your interests and could support a

9    conviction against you.

10             THE WITNESS:  Yes, sir.

11             THE COURT:  And that's called asserting your Fifth

12   Amendment right.

13             THE WITNESS:  Yes, sir.

14             THE COURT:  And you have conferred with your attorney

15   about this?

16             THE WITNESS:  Yes, sir.

17             THE COURT:  And I understand your attorney has advised

18   you that you should invoke the Fifth Amendment; that is, not

19   testify.

20             THE WITNESS:  Yes, sir.

21             THE COURT:  But is it your desire to testify?

22             THE WITNESS:  Yes, sir.

23             THE COURT:  Okay.  Just a minute.  Were you sworn?

24             THE CLERK:  Yes.

25             THE COURT:  You swore him in?  Okay.

1          Now, what did you say your age is?

2          THE WITNESS:  I'm going on 25, sir.

3          THE COURT:  Pardon me?

4          THE WITNESS:  I'm going on 25.

5          THE COURT:  25?

6          THE WITNESS:  Yeah.

7          THE COURT:  How far did you go in school?

8          THE WITNESS:  How far?

9          THE COURT:  Yes.

10          THE WITNESS:  I'm a junior, sir.

11          THE COURT:  You're going to have to -- would you hold

12  on to that mike with your hand and speak very slowly?  I'm

13  having difficulty -- I know that you have the handcuffs on.

14          Now, how old are you?

15          THE WITNESS:  I'm going on 25, sir.

16          MR. FEAGA:  Just one second.  The Court asked if he was

17  sworn, and we didn't hear who said he was.  We just want to be

18  sure --

19          THE COURT:  The courtroom deputy.

20          MR. FEAGA:  -- because we've got a number of people in

21  the courtroom that don't think he was.

22          He was sworn?

23          THE CLERK:  I just swore him in.

24          MR. FEAGA:  Oh, Anthony said he -- okay.  Great.  Thank

25  you, Your Honor.  I just wanted to satisfy everybody.

```
 1            THE COURT:  You were sworn in; is that correct?

 2            THE WITNESS:  Yes, sir.

 3            THE COURT:  Okay.  Now, how old did you say that you

 4   are?

 5            THE WITNESS:  I'll be 25 October 1st.

 6            THE COURT:  And how far did you go in school?

 7            THE WITNESS:  I'm a junior, sir.

 8            THE COURT:  A junior?

 9            THE WITNESS:  Yes, sir.

10            THE COURT:  In college.

11            THE WITNESS:  Yes, sir.

12            THE COURT:  Then you're able to read, write, and

13   understand the English language?

14            THE WITNESS:  Yes, sir.

15            THE COURT:  Now, have you recently seen a psychiatrist

16   or a physician for any health problems?

17            THE WITNESS:  No, sir.

18            THE COURT:  Are you suffering from any type of mental

19   illness or physical illness?

20            THE WITNESS:  No, sir.

21            THE COURT:  Are you now under the influence of any

22   drugs or alcohol?

23            THE WITNESS:  No, sir.

24            THE COURT:  In fact, you're in prison right now; is

25   that correct?
```

1          THE WITNESS:  In jail.

2          THE COURT:  In jail.

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Now, your attorney is here.  Where is he?

5          MR. WHITE:  Right here, Your Honor.

6          THE COURT:  And would you give us your name?

7          MR. WHITE:  Yes, sir.  Richard White, W-H-I-T-E.

8          THE COURT:  Okay.  Do you know of any reason to doubt

9  his competency, that he's suffering from any type of mental or

10 physical illness?

11         MR. WHITE:  Not that I'm aware of, Your Honor.

12         THE COURT:  Does the U.S. attorney?

13         MR. SNYDER:  I don't have any specific information.

14 I've never had any personal conversations with --

15         THE COURT:  That's right.  You said you had not had any

16 direct contact with him.

17         MR. SNYDER:  No.  I've never met him.

18         MR. FEAGA:  Your Honor, it would be our position that

19 he is competent and knows exactly what he's doing today.

20         THE COURT:  Mr. Rasmussen, you've talked to him, have

21 you not, before?

22         MR. RASMUSSEN:  For a few minutes, Your Honor, I have.

23         THE COURT:  Did you notice anything that would

24 undermine his competency?

25         MR. RASMUSSEN:  No, Your Honor.

1    THE COURT:  The Court finds that he is competent.

2    And is it your desire -- let me ask you this.  Has

3  anyone forced you or said anything to you or made you any

4  promise that induced you -- that is, made you desire -- to waive

5  your rights under the Fifth Amendment not to testify?

6    THE WITNESS:  Like my attorney, like yesterday, he told

7  me --

8    THE COURT:  Speak -- say that again, now.

9    THE WITNESS:  Like yesterday, when I was with my

10  attorney yesterday, he told me about that he wants me to plead

11  the Fifth, that the government got -- that the government got a

12  deal for me.  So I let him know about that.  I was -- I was

13  going to think about it.  So I finally made up my mind this

14  morning I was going to speak the truth.

15    THE COURT:  I am really having a hard time

16  understanding you.

17    THE WITNESS:  Yeah.  Like I said, my attorney told me

18  to plead the Fifth.

19    THE COURT:  Your lawyer told you to take the Fifth?

20    THE WITNESS:  Yes, sir.  I told him I was going to

21  think about it.

22    THE COURT:  You were going to think about it.

23    THE WITNESS:  Because I told him I was going to speak

24  the truth about what happened.  So I finally thought about it

25  last night, that I was going to speak the truth about it today.

1        THE COURT:  So has anyone forced you to give up your

2   right under the Fifth Amendment?

3        THE WITNESS:  No, sir.

4        THE COURT:  Has anyone promised you anything to give up

5   your right under the Fifth Amendment?

6        THE WITNESS:  No, sir.

7        THE COURT:  Has anyone threatened you or threatened

8   someone who's close to you to get you to give up this right?

9        THE WITNESS:  No, sir --

10       THE COURT:  And is it your desire to waive your right

11  under the Fifth Amendment?

12       THE WITNESS:  Yes, sir.

13       THE COURT:  The Court also finds that his waiver is

14  voluntary.  You may ask him the questions now outside the

15  presence of the jury.  Let's just see what happens.

16  Q.  (Mr. Rasmussen, continuing:)  Now, sir, you -- first of all,

17  you've been in custody for the past several days or weeks.

18  A.  Yes, sir.

19  Q.  And yesterday or the day before, did your attorney contact

20  you and tell you what the government wanted -- was offering you?

21  A.  Yes, sir.

22  Q.  What -- what did you understand to be the government's

23  offer?

24  A.  He told me like -- okay.  If I take the Fifth Amendment,

25  that they probably give me -- that I'd go to court sometime --

1  probably like October or November, that I'd probably go home.

2  But he wasn't -- I mean he wasn't sure I was going to get it put

3  back on.

4  Q.  Okay.  And if you didn't take the Fifth and if you

5  testified?

6  A.  He said if I testified, I'd probably be -- that the

7  government is going to take it strict on me.  I've probably got

8  five to seven years in prison.  And I was like -- I wasn't ready

9  to -- I mean -- not to testify because I'm an innocent person.

10  I would really like to testify for him, speak the truth about

11  what happened.

12  Q.  And when did this happen?

13  A.  I believe it was yesterday.

14  Q.  All right.  Now, do you know Mr. Balogun?

15  A.  Yes, sir.

16  Q.  How long have you known Mr. Balogun?

17  A.  Five years.

18  Q.  All right.  Does he have a car?

19  A.  Yeah.

20  Q.  Or did he have a car in 2005 and 2006?

21  A.  He used to drive a car.

22  Q.  Did you have a car in 2005 and 2006?

23  A.  I never had a car.

24  Q.  All right.  Do you know whether or not Mr. Balogun would

25  drive people around?

1  A.  Yes, sir.

2  Q.  Do you know whether or not he drove you around at your

3  request from time to time?

4  A.  Yes, sir.

5  Q.  Do you recall going to Montgomery, Alabama, with him?

6  A.  Yes, sir.

7  Q.  And tell us about that.

8  A.  Okay.  Concerning -- concerning the check, right?

9  Q.  Talking about the check.  Yes.

10  A.  Okay.  When I got the check, we went to -- I told him I

11  needed to deposit the check into -- into my account.  So --

12        THE COURT:  You told him what, now?

13        THE WITNESS:  I told him I needed to -- I needed him to

14  let me put the check into my account.

15  A.  But I never told him where I got the check from.  So we went

16  to Montgomery.  On our way -- I mean our plan when we went to

17  Montgomery was to go to Montgomery Mall to go shop.  So we used

18  that opportunity to kill two birds, so we went over there.

19  First we went to the bank, because I told him to put the check

20  into my account for me.  I never had told him the check was a

21  fraudulent check.  So he went to the bank and put the check into

22  the account for me.

23  Q.  So you never told him it was fraudulent?

24  A.  No, sir.

25  Q.  All right.  Now, when you got to the bank, what did you do?

1  A.  Okay.  When we got to the bank, actually, I was on the

2  phone, like an international call to my mom back home.  So I

3  used the opportunity to tell him to go put the check into my

4  account for me.  So he went to the bank and did it.

5  Q.  All right.  And you never told him it was a bad check.

6  A.  No, sir.

7  Q.  Okay.  Did you know it was a bad check?

8  A.  Yeah.  Like after I got a check from the person that gave it

9  to me in New York, when I came back to Troy I found out it was a

10  bad check.  So we went to Montgomery to put the check into the

11  account without him knowing the check was fraudulent.

12  Q.  All right.  I believe that's -- I believe that's sufficient

13  for right now for me to make a judgment, Your Honor.

14          THE COURT:  Judgment about what?

15          MR. RASMUSSEN:  About whether or not I want to call

16  him.

17          THE COURT:  Oh, you haven't decided whether you want to

18  call him or not?

19          MR. RASMUSSEN:  Not entirely.  No, Your Honor.  I

20  believe I do, but I'm not entirely a hundred percent.

21          THE COURT:  Well, we're ready to proceed.

22          MR. RASMUSSEN:  I understand that.  I can tell you in

23  about two minutes.

24          THE COURT:  You have two minutes.

25          MR. FEAGA:  Can I ask him a question, Judge?

```
 1            THE COURT:  Well, before you do that, let me find out
 2   whether he wants to call him.  Well, go ahead and ask your
 3   question while he's making up his mind.
 4            MR. FEAGA:  Thank you, Your Honor.
 5                        CROSS-EXAMINATION
 6   BY MR. FEAGA:
 7   Q.  Mr. Taiwo --
 8   A.  Yes, sir.
 9   Q.  -- if you testify today, is it your intention to tell the
10   truth?
11   A.  The truth, sir.
12   Q.  Let's test that real quick.  Would you pick yourself out of
13   that photo, please?  Where are you in that picture?
14   A.  I'm here, sir.
15   Q.  Which one?
16   A.  (Indicating)
17   Q.  That's you with your back --
18   A.  Yes, sir.
19   Q.  -- to these folks?
20   A.  Yes, sir.
21            MR. FEAGA:  Okay.  Thank you very much.
22            THE COURT:  Can you identify any of the other people
23   who are in the photograph?
24            THE WITNESS:  Yes.
25            THE COURT:  Who else?
```

```
 1          THE WITNESS:  There's Balogun.  Balogun right here.
 2   Q.  That's Balogun in the blue shirt and you in the black shirt
 3   with the bird on the back?
 4   A.  Yes.  They call me the Birdman.
 5   Q.  Okay.  Are you the guy in the --
 6          COURT REPORTER:  I'm sorry.  I can't hear you both at
 7   the same time.
 8          MR. FEAGA:  I'm sorry.
 9   Q.  Who is the guy in the red shirt, second from the left?
10   A.  That one of my friend in Georgia.
11   Q.  In Georgia?
12   A.  Yes, sir.
13   Q.  Is his name Jacob?
14   A.  Yes, sir.
15   Q.  What's his last name?
16   A.  I can't recall his last, but his name Jacob.
17   Q.  Is he from Nigeria, too?
18   A.  Yes, sir.
19   Q.  How about this guy right here?
20   A.  That look like a friend of mine, too.  His name is -- we
21   call him Arto.  Arto.
22   Q.  Arto?  What's his last name?
23   A.  Last name I believe is Japard.  I'm not real sure.  Japard.
24   Q.  And how about this guy?
25   A.  Yeah.  That's -- we call him Kiki.
```

1  Q.  Okay.  And this one?

2  A.  That is -- that is -- I don't know his real name.  We call

3  him Kapul.  I don't know his real name.

4          MR. FEAGA:  That's all I had, Your Honor.

5          THE COURT:  Have you decided?

6          MR. RASMUSSEN:  Yes, Your Honor.  We're not going to

7  call him.

8          THE COURT:  You're not going to call him.

9          MR. RASMUSSEN:  Yes, sir.

10          THE COURT:  Okay.  Then you're excused.

11          Who's your next witness?

12          MR. RASMUSSEN:  Sai Chapitah.

13          THE COURT:  Sai Chapitah?

14          MR. RASMUSSEN:  Yes.

15          MR. WHITE:  Your Honor, are we excused?

16          THE COURT:  Yes.  Let me make sure from the

17  government.  Can we excuse this witness?

18          MR. FEAGA:  Pardon me, Your Honor?

19          THE COURT:  Can we excuse this witness?

20          MR. FEAGA:  Yes, Your Honor.  If they're not calling

21  him, he's excused.

22          THE COURT:  Very good.  You are excused.

23          MR. WHITE:  Thank you, Judge.

24          THE COURT:  I think our jury is to be here in ten

25  minutes.  Are there any other matters to take up?

1          MR. RASMUSSEN:  My witness isn't here yet, Your Honor,

2    but she promised she would be here.

3          THE COURT:  We'll start promptly at 9:30, then.  We'll

4    be in recess until 9:30.

5      (End of excerpt)

6                         * * * * * * * * * * *

```
 1                    COURT REPORTER'S CERTIFICATE

 2           I certify that the foregoing is a correct transcript

 3   from the record of proceedings in the above-entitled matter.

 4           This 20th day of May, 2008.

 5

 6                                   /s/ Risa L. Entrekin
                                     Registered Diplomate Reporter
 7                                   Certified Realtime Reporter
                                     Official Court Reporter
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```